**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT** | : | **CIVIL ACTION NO. 1:09-CV-1874** |
| **OPPORTUNITY COMMISSION**, | : | |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **THE STANDARD REGISTER** | : | |
| **COMPANY**, | : | |
| | : | |
| **Defendant** | : | |

**MEMORANDUM**

The Equal Employment Opportunity Commission (the "EEOC") brings this action on behalf of Penny L. Zink ("Zink"), alleging that Zink was the victim of unlawful sex-based harassment during her employment with the Standard Register Company ("Standard Register"). Presently before the court is Standard Register's motion for summary judgment (Doc. 21). For the reasons that follow, the motion (Doc. 21) will be granted.

**I.     Statement of Facts and Procedural History**[1]

**A.     Zink's Employment**

Zink began working for Standard Register, a document management services company, on February 14, 2005, at their plant in York, Pennsylvania. (Doc.

---

[1] In accordance with the standard of review for a motion for summary judgment, the court will present the facts in the light most favorable to the EEOC, the nonmoving party. See infra Part II.

23 ¶ 17; Doc. 26 ¶ 17).  Initially, Zink worked as a miscellaneous forms finisher in the

bindery department, and her responsibilities included shrink wrapping, filling out

packing forms, putting forms in packed boxes, or cutting or folding forms,

depending on the day.  (Doc. 23 ¶¶ 17, 19; Doc. 26 ¶¶ 17, 19).  In June of 2006, Zink

sought a transfer to a different department.  (Doc. 21 Exh. 20).  Zink's application

indicated that "advancement" was her reason for transfer, (id.), but subjectively, as

the employee with the lowest seniority in the bindery department, Zink was

concerned that a possible layoff in the bindery department would cause her to lose

her job.[2]  (Doc. 23 ¶¶ 23-24; Doc. 26 ¶¶ 23-24).  After Zink passed prerequisite tests

for written knowledge and physical aptitude, Standard Register transferred her to

its coating department.  (Doc. 23 ¶¶ 32, 35; Doc. 26 ¶¶ 32, 35).

On July 24, 2006, Zink began working as a trainee on the coater machine, a

printing press that applies special security coatings to paper, e.g., checks.  (Doc. 23

¶¶ 31, 39; Doc. 26 ¶¶ 31, 39).  The coater is the largest machine in the plant; it is

approximately two stories tall and fifty yards long.  (Doc. 23 ¶ 30; Doc. 26 ¶¶ 30, 173;

Doc. 29 ¶ 173).  It is feasible for one individual to operate the coater alone, and each

coater operator has occasionally done so, but typically, two employees work

together to operate the coater.  (Doc. 26 ¶¶ 190-191; Doc. 29 ¶¶ 190-191).  Coater

operators work in three shifts to keep the coater machine operating 24 hours a day.

---

[2] Zink and the union president had discussed the possibility that Standard
Register might lay off an employee from the bindery department.  (Doc. 23 ¶ 23;
Doc. 26 ¶ 23).  Ultimately, however, no layoffs occurred in that department during
the summer of 2006.  (Doc. 23 ¶ 47; Doc. 26 ¶ 47).

(Doc. 23 ¶ 36; Doc. 26 ¶ 36).  When Standard Register transferred Zink to the coating department, Brian Guise ("Guise") and Matthew Oyler ("Oyler") worked during the first shift, 7 a.m. to 3 p.m., and Dwane Young ("Young") and Harry Mundy ("Mundy") worked during the third shift, 11 p.m. to 7 a.m.  (Doc. 23 ¶¶ 36-37; Doc. 26 ¶¶ 36-37).  Standard Register assigned Zink to work during the second shift, 3 p.m. to 11 p.m., with Nicholas Wire ("Wire"), another new coater operator, who had been a press operator in Standard Register's press department since approximately December 2003.  (Doc. 23 ¶¶ 37-38; Doc. 26 ¶¶ 37-38).  Zink was the first—and to date, the only—female to work for Standard Register as a coater operator.  (Doc. 26 ¶¶ 202-203; Doc. 29 ¶¶ 202-203).

For two weeks, Guise trained both Zink and Wire, separately, on their new jobs as coater operators.  (Doc. 23 ¶¶ 40-41; Doc. 26 ¶¶ 40-41).  After their training periods were complete, Wire and Zink worked together, with Wire acting as the "lead operator," because of his experience as a press operator, and Zink working as his "helper."  (Doc. 23 ¶ 175; Doc. 26 ¶ 175).  Wire, as lead operator, was responsible for "set[ting] the slitting and 'signing his name' to the job[,]" whereas Zink was responsible for hanging rolls and assisting Wire in setting up the coater machine. (Doc. 23 ¶ 176; Doc. 26 ¶ 176).

## B.   Zink's Workplace Complaints

On or about August 9, 2006, a few days after Zink's training period ended, Zink requested to return to her previous position as soon as possible.  (Doc. 23 ¶ 48; Doc. 26 ¶ 48).  She informed the plant manager that she did not feel safe working at

the coater without assistance, and she felt that Oyler left her alone too often.[3]   (Doc. 23 ¶¶ 48-49; Doc. 26 ¶¶ 48-49).   The plant manager consulted with the human resources manager, who then contacted Zink to explain that Standard Register could not return her to the bindery department, because such a transfer would constitute a downgrade prohibited by the union's collective bargaining agreement. (Doc. 22 at 8; Doc. 23 ¶ 52; Doc. 25 at 9; Doc. 26 ¶ 52).   The union president similarly informed Zink that, in order for Standard Register to return her to her old job, it would have to make a determination that she could not perform her work as a coater operator.   (Doc. 23 ¶ 54; Doc. 25 at 9; Doc. 26 ¶ 54).   Zink continued working as a coater operator thereafter.

In October 2006, Zink complained that Wire was not providing her with sufficient training, and that Wire had called her "fucking stupid."[4]   (Doc. 23 ¶¶ 55, 58; Doc. 26 ¶¶ 55, 58).   Within a day, Zink and Wire had a meeting with the plant manager, Tracy Green ("Green"), and the human resources manager, Rosilee Hardin ("Hardin"), to address Zink's concerns.   (Doc. 23 ¶ 57; Doc. 26 ¶ 57).   Hardin advised Wire that using the "F word" was not acceptable, and according to Zink, Hardin also warned both Zink and Wire that one of them could lose their job if they

---

[3] Zink did not allege that Oyler was absent because of her sex or that Oyler was otherwise discriminating against her.   (Doc. 23 ¶ 50; Doc. 26 ¶ 50).

[4] Neither Zink nor anyone else alleged that Zink's sex was the basis for Wire's conduct.   (Doc. 23 ¶¶ 63-64; Doc. 26 ¶¶ 63-64).   The human resources manager did not perceive Wire's conduct to be motivated by the fact that Zink is female.   (Doc. 23 ¶ 65; Doc. 26 ¶ 65).

4

were unable to work together. (Doc. 23 ¶¶ 60-61; Doc. 26 ¶¶ 60-61). Zink and Wire

resumed working together after this meeting. (Doc. 23 ¶ 66; Doc. 26 ¶ 66). Zink

admits that, by January 2007, Wire provided her with better training, in

anticipation of his departure from the coating department. (Doc. 21 Exh. 1 at 416;

Doc. 23 ¶ 69; Doc. 26 ¶ 69).

On January 25, 2007, Zink reported another issue of concern to Standard

Register's new human resources manager, Jill Bohannon ("Bohannon"), who met

with Zink, a union representative,[5] and plant manager Green. (Doc. 23 ¶¶ 72, 74-75;

Doc. 26 ¶¶ 72, 74-75). Zink told Bohannon that, the previous day, Wire had told Zink

that Mundy was out to get her and would not work with her, upon Wire's departure.

(Doc. 23 ¶¶ 74, 76; Doc. 26 ¶¶ 74, 76). Zink also reported a past confrontation with

---

[5] Zink alleges that the union representative, Mike Conway ("Conway"), told Bohannon that Zink's male coworkers didn't want a female to operate the coater machine. (Doc. 26 ¶ 183). Zink's own testimony is the only evidence in the record supporting this averment. Conway denies making the statement, to Bohannon or to anyone else. (Doc. 28 Exh. 34 ¶ 2). Bohannon denies receiving any indication that Zink's complaints related to her sex, until the company received the EEOC charge. (Doc. 21 Exh. 2 at 277).

Standard Register urges the court not to take Zink's hearsay testimony into consideration. The court, however, is not convinced that the evidence at issue necessarily qualifies as hearsay, because the EEOC might offer this statement into evidence for some purpose other than "to prove the truth of the matter asserted." See FED. R. EVID. 801(c). For instance, the EEOC could rely on this statement simply to show that Standard Register had notice that Zink's sex may have been the cause of the issues arising between Zink and her coworkers. Insofar as Zink's testimony on this matter is capable of being admissible at trial, the court may consider it at the summary judgment phase. See Shelton v. Univ. of Med. & Dentistry, 223 F.3d 220, 223 n.2 (3d Cir. 2000) ("In this circuit, hearsay statements can be considered on a motion for summary judgment if they are capable of admission at trial.") (citing Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc., 63 F.3d 1267, 1275 n.17 (3d Cir. 1995)).

Mundy, which occurred in October of 2006, and which Zink had never previously reported. (Doc. 23 ¶¶ 77, 79; Doc. 26 ¶¶ 77, 79). Zink stated that, in October 2006, Mundy yelled at her, with his fists clenched at his sides, and she yelled back at him. (Doc. 23 ¶ 78; Doc. 26 ¶ 78). Bohannon promised to investigate Zink's concerns. (Doc. 23 ¶ 80; Doc. 26 ¶ 80). She also inquired about Zink's working relationship with Wire, and Zink reported that it was fine. (Doc. 23 ¶ 81; Doc. 26 ¶ 81; Doc. 21 Exh. 2 at 156). Bohannon then spoke with Wire, who denied making the statements alleged by Zink, concerning Mundy's willingness to work with her. (Doc. 23 ¶ 82; Doc. 26 ¶ 82). She later questioned Mundy, who admitted yelling at Zink in October 2006, but denied saying that he would not help her. (Doc. 23 ¶¶ 83-84, 86; Doc. 26 ¶¶ 83-84, 86). Bohannon advised Mundy to treat others respectfully, and to take issues to a supervisor when necessary, and she reminded him about Standard Register's anti-harassment policy. (Doc. 23 ¶ 87; Doc. 26 ¶ 87).

In early February of 2007, Zink took steps towards filing a union grievance, on the basis that the union failed to represent her adequately when she raised the issues discussed above. (Doc. 26 ¶ 187; Doc. 29 ¶ 187). There is no evidence that Standard Register had notice of this grievance. The union declined to process Zink's grievance. (Doc. 26 ¶ 188; Doc. 29 ¶ 188).

Wire left the coating department, as anticipated, on or about February 25, 2007, and after his departure, Zink was the sole coater operator assigned to second shift. (Doc. 26 ¶ 189; Doc. 29 ¶ 189). Zink is the only one of Standard Register's coater operators to be assigned to a shift without another coater operator. (Doc. 26

6

¶ 190; Doc. 29 ¶ 190).  Although each operator has operated the coater machine

alone on certain occasions,[6] no other operator regularly worked without another

operator.  (Doc. 26 ¶¶ 190-191; Doc. 29 ¶¶ 190-191).  When Green, Bohannon, and

other employees of Standard Register asked Zink how she felt about operating the

coater alone,[7] she told them she felt she could do it if necessary.  (Doc. 23 ¶¶ 92-94;

Doc. 26 ¶¶ 92-94; Doc. 29 ¶¶ 92-94).  Zink was, in fact, capable of operating the coater

alone, and she did so, without ever receiving discipline for poor performance.  (Doc.

23 ¶¶ 100-101; Doc. 26 ¶¶ 100-101).  However, as the court will discuss *infra*, Zink

later filed a grievance about her operation of the coater without assistance.[8]

---

[6] By way of example, the parties agree that if one coater operator took a sick day, and no other operators were available to cover his shift, then the other coater operator assigned to the same shift would operate the coater machine alone.  (Doc. 26 ¶ 190; Doc. 29 ¶ 190).

[7] The parties do not agree when anyone posed such a question to Zink; however, the evidence of record clearly reflects that it occurred prior to March 7, 2007.  (See Doc. 21 Exh. 1 at 290; Doc. 23 ¶ 92; Doc. 26 ¶ 92; Doc. 29 ¶ 92).

[8] The record does not clearly establish when Zink began to express her dissatisfaction with the arrangement.  The EEOC avers that Zink made a "number of complaints . . . which went unanswered[,]" (Doc. 26 ¶ 94), but it fails to support this allegation with a citation to any evidence of record.  The evidence of record only reflects that Zink filed a formal grievance regarding this issue on April 4, 2007. (Doc. 21 Exh. 22).

The next occasion on which Zink raised a complaint with Standard Register

was March 7, 2007.[9]  On this date, Zink met with Bohannon and notified her that

Young told her that her work "looked like 'shit.'"[10]  (Doc. 23 ¶ 108; Doc. 26 ¶ 108).

Bohannon inquired whether Zink was having problems with any other coater

operators, and Zink responded that she was not.  (Doc. 21 Exh. 2 at 221; cf. Doc. 26

Exh. B at 413).  After meeting with Zink, Bohannon spoke to Young about his

alleged remark.[11]  (Doc. 23 ¶ 113; Doc. 26 ¶ 113; Doc. 21 Exh. 2 at 200).  She advised

him that the language Zink accused him of using was inappropriate language, and

---

[9] The EEOC's submissions in the instant case describe a few additional incidents, which were bothersome to Zink, but which she did not report to Standard Register.  For instance, Zink complains that on February 26, 2007, the coater operators who worked during first shift did not perform any work to set up the coater machine, and she had to perform a setup alone, a task which she characterized as difficult.  (Doc. 26 ¶ 192; Doc. 29 ¶ 192).  Zink also alleges that the coater was shut down the following day, which is highly unusual.  (Doc. 26 ¶ 193; Doc. 29 ¶ 193).  In addition, Zink claims that, on the same day, she asked Young to help her enter information on a computer, but Young walked away without helping her.  (Doc. 26 ¶ 194; Doc. 29 ¶ 194).  The record does not show that Zink ever reported these incidents to her employer.

[10] Zink contends that Conway was also present at the meeting, and that he suggested to Bohannon that "it's a male and female thing."  (Doc. 26 ¶ 196).  She fails to support this allegation with any evidence of record other than her own testimony, however; and Conway and Bohannon both deny that Conway made any such statement.  (See Doc. 28 Exh. 34 ¶ 2; Doc. 21 Exh. 2 at 277).  Nevertheless, the court has concluded that Zink's testimony about this alleged event may be capable of admission at trial.  See supra note 5.  Therefore, the court may consider this testimony at the summary judgment phase.  See Shelton, 223 F.3d at 223 n.2.

[11] Zink also alleges that, on the same occasion, Young insulted her by saying that Zink could come to work and do nothing, because plant manager Green did not expect any production from Zink.  (Doc. 21 Exh. 1 at 292).  The record is unclear whether Zink actually reported this alleged statement to Bohannon.

she reminded him of Standard Register's anti-harassment policy, code of ethics, and its expectations that all employees should treat each other respectfully.  (Id.) She also warned him that disciplinary action would ensue if Standard Register determined that an employee violated its policy, or if she received another report that he used inappropriate language in the workplace.  (Id.)  Bohannon also met with Guise and Oyler, to inquire whether the coater department "was operating the way it should."  (Doc. 23 ¶ 114; Doc. 26 ¶ 114).

On or about March 9, an ink spill occurred as a result of the fact that certain protective caps were not in place on the coater.  (Doc. 23 ¶ 131; Doc. 26 ¶ 131).  Zink believed that one or more of the other coater operators deliberately left the caps off in order to cause a spill, as an act of sabotage, and she alerted her shift supervisor, Bill Whipp ("Whipp"), about her suspicion.  (Doc. 23 ¶¶ 131-132; Doc. 26 ¶¶ 131-132).  Whipp investigated by asking Oyler about the incident, and Oyler indicated that the coater operators commonly leave the caps off.  (See Doc. 26 Exh. K at 77-78; Doc. 21 Exh. 9 at 51-52).  Other coater operators corroborated Oyler's statement.  The coater operators testified that ink spills occur only infrequently as a result of caps not being in place.  (See Doc. 21 Exh. 9 at 51-52; Doc. 26 Exh. E at 94, 121; Doc. 26 Exh. F at 140).  After this ink spill, a reminder to place protective caps back on the

coater was posted on the coater operators' work bench.[12]  (Doc. 23 ¶ 135; Doc. 26 ¶ 135).

Also on or about March 9, Zink reported another issue to Whipp.  (Doc. 23 ¶ 115; Doc. 26 ¶ 115).  She was troubled by a posting on a bulletin board—specifically, an overtime schedule, on which an unidentified individual had written comments and drawn frowning faces with tears.  (Doc. 21 Ex. 24; Doc. 23 ¶ 116; Doc. 26 ¶ 116)  This anonymous individual wrote "No Overtime", "The '<u>Rest</u>' of the <u>Year</u>!", "Forever", and "FOR Third Shift Only G.R." at the top of the overtime schedule.  (<u>See</u> Doc. 21 Ex. 24).  He or she also wrote "DON'T CRY" and drew one frowning face with tears on a line marked "COATER."  (<u>Id.</u>)  Another frowning face with tears appeared in a column for second shift workers, along with the words "I WANT OT" and "somebody has to do the work."  (<u>Id.</u>)  Whipp sent the overtime posting to Bohannon, along with a note explaining that Zink found the posting and was perturbed by it.  He advised that Zink brought the matter to his attention, but that he was "not sure what it means."  (Doc. 21 Ex. 25; Doc. 23 ¶ 117; Doc. 26 ¶ 117).  In the same note, Whipp informed Bohannon about the ink spill and Zink's belief that it was deliberate.  (Doc. 21 Ex. 25).  Bohannon did not independently investigate the ink spill; the information she received from Whipp led her to conclude that it was the type of incident that could happen to anyone.

---

[12] According to Zink, someone later moved the posting from one side of the work bench to the other; this bothered Zink because she concluded that someone moved the note in an attempt to be "smart."  (Doc. 23 ¶ 136; Doc. 26 ¶ 136).  The record does not reflect whether Zink reported this minor incident to Standard Register.

(Doc. 21 Exh. 2 at 239-241).  Nor did Bohannon investigate who was responsible for the overtime posting, because she found no reason to conclude that the posting referred directly to any employee, including Zink,[13] or to pinpoint any particular individual—or even a shift or a department—with responsibility for posting it.  (Id. at 232-36).

On April 4, 2007, Zink completed a grievance report, wherein she complained that the coater is a two-person operation and that operating it alone decreased her productivity and increased waste.[14]  (Doc. 21 Exh. 22).  In response, Standard Register assigned overtime to its first shift and third shift coater operators, to provide coverage on second shift.  The EEOC admits that the company considered "providing additional help to cover her entire shift," (Doc. 26 ¶ 106), but according to Zink, Standard Register never covered her entire shift; rather, it assigned a first shift employee to stay two hours late, and a third shift employee to arrive two hours early, so that Zink had assistance for only four hours of her shift, (see Doc. 21 Exh. 1 at 118).

In April 2007, Zink complained to Matt Lampinen ("Lampinen"), a shift supervisor, that Oyler was uncommunicative and failed to provide her with sufficient assistance when he worked overtime as her helper.  (Doc. 23 ¶¶ 139, 144-

---

[13] Mundy separately reported to Bohannon a belief that the posting was directed at him.  (Doc. 21 Exh. 2 at 232-33).

[14] Zink did not allege that her sex was the basis of Standard Register's failure to hire another coater operator to work with her.  (Doc. 21 Exh. 22; Doc. 23 ¶ 99; Doc. 26 ¶ 99).

145; Doc. 26 ¶¶ 139-140, 144-145; Doc. 29 ¶¶ 139-140).  Lampinen met with Zink and

Olyer, and they talked about Zink's concerns.  (Doc. 23 ¶¶ 146-147; Doc. 26 ¶¶ 146-

147).  Oyler told Zink that if she had a problem or a question, needed his help, or

wanted him to check her work, she simply needed to ask.  (Doc. 23 ¶¶ 142, 148; Doc.

26 ¶¶ 142, 148).  As he responded to Zink's complaints, Oyler became upset, raised

his voice, and used profanity.  (Doc. 23 ¶¶ 143, 148; Doc. 26 ¶¶ 143, 148).  Zink,

however, did not feel that Oyler said anything rude to her during the meeting, and

she did not complain to anyone about Oyler's behavior in the meeting.  (Doc. 23

¶¶ 143, 149; Doc. 26 ¶¶ 143, 149).  After the meeting, Lampinen prepared a memo

summarizing issue, and he sent the memo to Bohannon, who had a follow-up

meeting with Zink a few days later.  (Doc. 23 ¶ 151; Doc. 26 ¶ 151; Doc. 21 Exh. 71;

Doc. 21 Exh. 2 at 255, 258-259).  At this meeting, Zink told Bohannon that Young

was "the only one" communicating with her, and that Mundy was being "extremely

nice."  (Doc. 21 Exh. 2 at 258-260; cf. Doc. 26 Exh. B at 417).  Bohannon also directed

Whipp to follow up on Zink's concerns with Oyler, and he did so.  (Doc. 23 ¶ 154;

Doc. 26 ¶ 154).

     Zink resigned from her job with Standard Register on May 23, 2007.  (Doc. 23

¶ 161; Doc. 26 ¶ 161).  Prior to resigning, she had accepted a job as a machine

operator in the bindery department of Strine Printing.  (Doc. 23 ¶ 165; Doc. 26

¶ 165).  Zink testified that she waited until she found new employment to leave

Standard Register, and, if she had not obtained the position with Strine Printing,

she would not have resigned from Standard Register at that time.  (Doc. 23 ¶ 166; Doc. 26 ¶ 166).

### C.    Procedural History

On or about March 15, 2007, Zink submitted an intake questionnaire to the EEOC, which led to the issuance of an EEOC charge of discrimination, alleging that Zink's coworkers subjected her to sex-based harassment.  (Doc. 23 ¶ 156; Doc. 26 ¶ 156).  On September 29, 2009, the EEOC filed the instant suit, advancing a hostile work environment claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, on Zink's behalf.  On July 16, 2010, Standard Register filed the pending motion for summary judgment, arguing that the EEOC's harassment claim fails as a matter of law and that Standard Register is not vicariously liable for the alleged conduct of its employees.[15]  The parties have fully briefed the issues presented in Standard Register's motion, which is now ripe for disposition.

## II.    Standard of Review

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  See Fed. R. Civ. P. 56(c).  The burden of proof is upon the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief.

---

[15] Standard Register also argued that the EEOC's constructive discharge claim fails as a matter of law.  In response, the EEOC withdrew this claim, (see Doc. 27 at 2; Doc. 25 at 2, 30), obviating the need for further discussion of this claim.

Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); Fed. R. Civ. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also Fed. R. Civ. P. 56(c), (e).  Only if this threshold is met may the cause of action proceed.  Pappas, 331 F. Supp. 2d at 315.

## III.   **Discussion**

Title VII of the Civil Rights Act makes it unlawful for an employer "to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Sexual harassment that creates a hostile or abuse work environment is a violation of Title VII.  See Huston v. P&G Paper Prods. Corp., 568 F.3d 100, 104 (3d. Cir 2009) (citing Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d. Cir. 1999)).  In the case sub judice, the EEOC alleges that Zink was subjected to unlawful sex-based workplace harassment.  In order to establish a prima facie case for hostile work environment on the basis of sex, Zink must show evidence sufficient to demonstrate each of the following: (1) she suffered intentional discrimination because of her sex; (2) the discrimination was regular, and severe or pervasive; (3) the discrimination detrimentally affected

her; (4) the discrimination would detrimentally affect a reasonable female in the same position; and (5) *respondeat superior* liability[16] exists.  Id.

Standard Register argues that it is not liable for its employees' conduct at issue.  It also contends that Zink's evidence fails to show that actionable harassment occurred, that she was treated differently than other employees, or that any allegedly differential treatment was motivated by the fact that Zink is female. At the outset, the court will address the threshold issue of *respondeat superior* liability.

Zink alleges that her coworkers, not her supervisors, harassed her and created a hostile work environment.  Under such circumstances, an employer is liable for the allegedly hostile work environment only if: (1) "the employer failed to provide a reasonable avenue for complaint[,]" or (2) "the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action."  Huston, 568 F.3d at 104.  In other words, "an employer may be directly liable for non-supervisory co-worker sexual harassment only if the employer was negligent in failing to discover the co-worker harassment or in responding to a report of such harassment."  Id. at 104-105.

In the instant case, Zink does not allege that Standard Register failed to provide a reasonable avenue for complaint.  Nor does she dispute that Standard

---

[16] The Third Circuit has observed that, in this context, *respondeat superior* refers not to vicarious liability, but rather, it "connotes notice to the employer." Huston, 568 F.3d at 104-105 n.3 (quoting Kunin, 175 F.3d at 293 n.5).

Register has an anti-harassment policy, a code of ethics that reiterates its anti-harassment policy, and a variety of procedures through which employees can report harassment.  (Doc. 23 ¶¶ 1-7; Doc. 26 ¶¶ 1-7).  After careful review of these various policies and procedures, (Doc. 21 Exh. 12 at 2-4; Doc. 21 Exh. 13 at 8-9, 11-12), the undersigned concludes that Standard Register provided a reasonable avenue for complaint.  Accordingly, the court must examine the EEOC's contention that Standard Register knew or should have known that Zink's coworkers were harassing her, and that it failed to take appropriate remedial action.

According to the EEOC, Standard Register had actual knowledge of harassment, because Zink reported eight incidents to her supervisors, a plant supervisor, and human resources managers.  (Doc. 25 at 26-27).  Zink admits, however, that she did not characterize *any* of the incidents as gender-based harassment.  (Id.)  The EEOC argues, in the alternative, that Standard Register had constructive notice that Zink was the victim of gender-based harassment, because Bohannon saw fit to remind Zink's coworkers about Standard Register's anti-harassment policy, because a union representative allegedly told Bohannon that the conduct at issue was motivated by the fact that Zink is female,[17] and because of the number of incidents reported.  (Id. at 27).  The EEOC further contends that Standard Register is liable because it never issued any formal discipline to any of

---

[17] As set forth supra notes 5 and 10, Standard Register contends that Zink's testimony constitutes inadmissible hearsay.  The court, however, concludes that Zink's testimony may be admissible, if offered for a proper purpose, and that it may consider this evidence at the summary judgment phase.

her alleged harassers, and because its actions were not adequate to stop the harassment.  (Id. at 28-29).

The court need not resolve the question of whether Standard Register knew or should have known that Zink's coworkers were harassing her because of her sex;[18] this question is immaterial, because the court concludes that Standard Register diligently responded to Zink's complaints with prompt and appropriate remedial action.  Every time Zink reported an incident involving one of her coworkers, one of Standard Register's supervisors or managers responded in a timely manner, counseling the coworkers on appropriate behavior and the company's expectation of the same.  See supra Part I.B.  Significantly, Zink never raised multiple accusations of harassment against a single coworker; this fact alone strongly suggests that the individual counseling sessions were effective in curbing inappropriate behavior.  When an employer's remedial actions effectively stop harassing conduct, the employer cannot be held liable.  Knabe v. Boury Corp., 114 F.3d 407, 411 n.8 (3d Cir. 1997).

Zink experienced a series of problems with various coworkers.  As the EEOC points out, the prompt counseling of one coworker did not quash the harassing

---

[18] Although the court does not resolve the pending motion on the basis of this issue, the court notes that the EEOC has presented scant evidence supporting its contention that Standard Register knew or should have known that sex-based harassment was occurring.  Neither the number of complaints raised by Zink (eight, according to the EEOC), nor the fact that Bohannon reminded Zink's co-workers that Standard Register has an anti-harassment policy (which prohibits harassment "of any kind," not merely sexual harassment), undergird this contention.

conduct of other coworkers.  Hence, the EEOC contends that Standard Register's remedial actions were ineffective and that Standard Register cannot rely upon the asserted adequacy of its actions to avoid liability.  (Doc. 25 at 29).  Contrary to the EEOC's argument, the law does not require an employer to succeed in stopping harassment in order for its remedial actions to be deemed adequate.  Ineffective remedial actions are not necessarily inadequate; rather, "a remedial action is adequate if it is *reasonably calculated to prevent future harassment*."  Knabe, 114 F.3d at 411 n.8 (emphasis added).  The Third Circuit has noted that "it is possible that an action that proves to be ineffective in stopping the harassment may nevertheless be found reasonably calculated to prevent future harassment and therefore adequate."  Id.  Furthermore, the Knabe court held that counseling similar to that which occurred in this case—specifically, a reminder about the company's policy prohibiting sexual harassment—was an adequate remedial action as a matter of law, "because it was reasonably calculated to prevent further harassment" in the future.  Id. at 413.

In this case, Standard Register took swift remedial action by reminding employees of its anti-harassment policy, as described in detail supra Part I.B.  The EEOC has presented no evidence suggesting that Standard Register's actions were not reasonably calculated to prevent future harassment of Zink, and no reasonable jury could so conclude.  Hence, Standard Register's motion for summary judgment will be granted.  See Anderson, 477 U.S. at 249 ("[T]here is no issue for trial unless

there is sufficient evidence favoring the nonmoving party for a jury to return a

verdict for that party.").

In light of this conclusion, the other issues briefed by the parties—including

whether Standard Register knew or should have known that Zink was the victim of

illegal sex-based harassment,[19] whether Zink has adduced adequate evidence that

she was harassed because of her sex,[20] and whether the alleged harassment was

---

[19] See supra note 18.

[20] In order to satisfy the first prong of its *prima facie* case, the EEOC would
have to show causation—in other words, that the offensive behavior occurred
*because of* Zink's sex.  See Huston, 568 F.3d at 104.  As discussed supra note 18, the
EEOC has come forward with very little evidence on this issue, and the parties
dispute the admissibility of the EEOC's key piece of evidence linking the alleged
harassment to Zink's sex, see supra notes 5, 10, and 17.

sufficiently severe and pervasive to create a hostile work environment[21]—are

immaterial.  See Anderson, 477 U.S. at 248 ("Only disputes over facts that might

affect the outcome of the suit . . . will properly preclude the entry of summary

judgment.").  No further discussion of these issues is warranted.

---

[21] Assuming, *arguendo*, that the EEOC had established *respondeat superior* liability, the court could also grant summary judgment on the basis of its failure to show that the complained-of conduct was severe and pervasive enough to be actionable under Title VII.  See Meritor Savings Bank v. Vinson, 477 U.S. 57, 67 (1986) ("For sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." (internal quotation omitted)).  In determining whether the conduct at issue is sufficiently severe, a court must examine the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993); see also Caver v. City of Trenton, 420 F.3d 243, 262-63 (3d Cir. 2005).

The evidence in the instant case does not suggest that frequent, severe, or physically threatening or humiliating harassment occurred.  Rather, it suggests that Zink had a difficult time working with her coworkers—sometimes because of comments that they made, and on other occasions, because of a lack of communication.  Nevertheless, Zink was able to perform her job to the satisfaction of her supervisors, as evidenced by the fact that Standard Register never disciplined her for poor job performance.  (Doc. 23 ¶ 101; Doc. 26 ¶ 101).

Our sister district courts have examined similar—or more egregious—incidents in other cases, found that the alleged incidents did not create a hostile work environment, and granted summary judgment in favor of the employers.  See, e.g., Ahmed v. Lowe's Home Centers, Inc., 346 F. App'x 816, 821 (3d Cir. 2009) (affirming the district court's decision to grant summary judgment on the employee's hostile work environment claim); Allen v. AMTRAK, 228 F. App'x 144, 147 n.4 (3d Cir. 2007) (same); Page v. City of Pittsburgh, 114 F. App'x 52, 54-55 (3d Cir. 2004) (same); Ocasio v. Lehigh Valley Family Health Ctr., 92 F. App'x 876, 877-878, 880 (3d Cir. 2004) (same).

**IV.**   **Conclusion**

The EEOC has failed to establish an essential element of its hostile work

environment claim: *respondeat superior* liability.  The court has concluded that

Standard Register is not liable for the sexual harassment to which Zink's coworkers

allegedly subjected her, and it will therefore grant summary judgment in Standard

Register's favor.

An appropriate order follows.


 S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge


Dated:      March 28, 2011

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT** | : | **CIVIL ACTION NO. 1:09-CV-1874** |
| **OPPORTUNITY COMMISSION,** | : | |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **THE STANDARD REGISTER** | : | |
| **COMPANY,** | : | |
| | : | |
| **Defendant** | : | |

## <u>ORDER</u>

AND NOW, this 28th day of March, 2011, upon consideration of the motion

for summary judgment (Doc. 21) filed by the Standard Register Company

("Standard Register"), and for the reasons set forth in the accompanying

memorandum, it is hereby ORDERED that:

1.   The motion for summary judgment (Doc. 21) is GRANTED.

2.   The Clerk of Court is directed to enter JUDGMENT against the Equal
     Employment Opportunity Commission and in favor of Standard
     Register on all claims.

3.   The Clerk of Court is directed to CLOSE this case.


   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge